THE PURDY COMPANY OF ILLINOIS *et al.*, Plaintiffs-Appellants, v. TRANSPORTATION INSURANCE COMPANY, INC., Defendant-Appellee.

First District (5th Division)   No. 1—88—2306

Opinion filed February 1, 1991.

William J. Sneckenbert & Associates, Ltd., of Chicago (William J. Sneckenbert and Jonathan D. Moses, of counsel), for appellants.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James Ferrini, Randall Marmor, and Richard Winter, of counsel), for appellee.

JUSTICE GORDON delivered the opinion of the court:

Plaintiffs, The Purdy Company of Illinois (Purdy), and its wholly owned subsidiary, A.D. Schader Co. (Schader), filed a complaint for declaratory judgment in two counts against the defendant, Transportation Insurance Company, seeking a determination of their rights under the terms of an insurance policy issued by the defendant that insured against losses caused by employee dishonesty. Count I alleged that the defendant had breached the terms of the policy when it refused to indemnify the plaintiffs for the full amount of the losses caused by the defalcations of two of its former employees. Count II sought attorney fees and costs, under section 155 of the Illinois Insurance Code, alleging that the defendant's refusal to pay the total amount of the plaintiffs' actual loss was vexatious and unreasonable. (Ill. Rev. Stat. 1985, ch. 73, par. 767.) On its own motion, the trial court transferred this case to the law division, stating that although the plaintiffs filed a complaint for declaratory judgment, the allegation contained in count I was actually one asserting breach of contract and that count II sought damages caused by the alleged breach. Thereafter, the defendant filed a motion for summary judgment, which was granted by the trial court pursuant to section 2—1005 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005). Plaintiffs now appeal. We affirm the trial court's entry of summary judgment on both counts.

The uncontroverted submissions in support of the defendant's motion for summary judgment disclosed that in October of 1980, the defendant issued to the plaintiffs a comprehensive crime insurance policy. The insuring clause provided:

"1A *EMPLOYEE* DISHONESTY COMMERCIAL BLANKET COVERAGE

Loss of Money, Securities and other property which the Insured shall sustain, to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this Insuring Agreement 1A through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others."

The limit of liability for coverage under insuring agreement 1A was $250,000. Section 11 of the policy provided:

"RECOVERIES

Section 11. Payment of loss under Insuring Agreement 1A *** shall not reduce the Company's liability for other losses under [any of the Insuring Agreements] whenever sustained. The Company's total liability (a) under Insuring Agreement 1A for all loss caused by an employee or in which such employee is concerned or implicated *** is limited to the applicable amount of insurance specified in the Table of Limits of Liability ***."

In 1984, the plaintiffs submitted an insurance claim to the defendant in excess of $340,000 representing losses caused by the defalcations of two Schader employees, John Duffy, a vice-president, and John Fonesca, general manager, during the period from January 1, 1981, to November 27, 1984. Both men worked in Schader's office, which is located in Hayward, California.

The record disclosed that each employee rented post office boxes and opened checking accounts under the auspices of nonexistent companies and then submitted fraudulent invoices on behalf of these fictitious companies to plaintiffs for payment of equipment rental, materials and services. Duffy had established various fictitious companies, including one company called Steelco. In total, he diverted approximately $145,000 to these companies for his personal use, of which over $100,000 was diverted to Steelco. Fonesca established a fictitious company called Mass Trans to which he diverted approximately $12,000 for his personal use. Each employee by virtue of his position with Schader was authorized to approve payment of invoices.

The second method by which the two employees diverted plaintiffs' funds was through the submission of personal expenses for payment by plaintiffs. As conceded by plaintiffs, this scheme was accomplished by the two employees' mutual approval of each other's expense reports in contravention of known company policy requiring that all expenses be supported by proper documentation. It was estimated that over $85,000 was diverted for Duffy's personal expenses, and over $55,000 for Fonesca's personal expenses. It was further estimated that over $25,000 was diverted for the remodeling of one or both of the two employees' private residences.

After proofs of these losses were filed with the defendant, it retained Surety Service Corporation (Surety) to further investigate plaintiffs' claim. In January 1985, after the investigation was completed, the defendant notified the plaintiffs that its maximum liability on the entire claim would be $250,000, an amount which it promptly paid. Defendant, therefore, denied payment for the balance of the plaintiffs' claim in excess of $250,000 on the ground that Duffy and Fonesca had acted in collusion.

The undisputed record established that of the many Schader checks made payable to Steelco, during 1982, more than 10 checks were co-signed by Duffy and Fonesca jointly. And at least one other Schader check made payable to Steelco was signed by Fonesca only. With respect to Mass Trans, the record does not disclose whether any Schader checks made payable to Mass Trans were co-signed by Fonesca and Duffy jointly. It was established, however, that at least one check dated in 1984 and made payable to Mass Trans was signed by Duffy only.

As previously noted, it was further shown that Fonesca and Duffy co-signed Schader checks in excess of $25,000 made payable to a construction and a lumber company for labor and materials used to remodel one or both of their private residences. One of the invoices issued by the construction company and paid by a Schader check co-signed by both Duffy and Fonesca bore Fonesca's home address.

Among the submissions in support of defendant's motion were two letters. One letter was written by plaintiffs' president, John P. Purdy, to Duffy in which he states that Duffy "admitted" to Purdy and other Purdy executives that Duffy and Fonesca "had conspired to divert finds illegally" through Steelco and Mass Trans. The letter stated further: "In addition, by your own admission, this same situation applied to expense accounts which were for non-business expenses and not supported by receipts or other evidence of being business related." The second letter was written by plaintiffs'

vice-president, Robin Purdy, to notify the defendant that company funds had been diverted into fictitious companies established by two employees, "acting in collusion," and that both employees "would knowingly approve each other's expense accounts," an action that Robin Purdy stated was admitted by Duffy subsequent to his resignation.

In an interoffice memorandum dated March 30, 1984, Duffy, in response to Purdy's inquiry of the propriety of a Mass Trans invoice, advised Purdy that Mass Trans was a Canadian company that sold equipment to plaintiffs and required payment on a cash-on-delivery basis. Duffy stated further that he was enclosing with the memo photographs "taken by" him of Mass Trans' equipment. The photographs were not a part of the record.

According to the undisputed affidavit of the general manager of the San Francisco 49ers Football Club, Inc., five 1983 season tickets were purchased through an account bearing the name John Fonesca. After the club sent an invoice to Fonesca for payment, it received two documents:

> 1. a *Steelco* check, dated February 1983, made payable to the club in the amount owed, and signed by *Duffy*; and
>
> 2. Fonesca's handwritten transmittal note, dated March, 1983, forwarding this check.

Four tickets for the Oakland Athletics' 1983 baseball season were purchased by a Steelco check signed by Duffy through an account bearing the name John Fonesca, which was likewise established by an uncontroverted affidavit of the Oakland A's general manager.

An additional *Steelco* check dated April 16, 1984, and signed by Duffy was made payable to "John Duffy—John Fonesca PRTN," marked with the notation "Advance."

The evidence was also undisputed that in early 1983 Fonesca applied for and opened a post office box for Mass Trans. On the application for the post office box, Fonesca named Duffy as a personal reference.

In response to the defendant's motion for summary judgment and its supporting submissions, plaintiffs filed a memorandum in opposition to the motion and attached affidavits of plaintiffs' president and vice-president and additional submissions. In their affidavits, both John and Robin Purdy repudiated their earlier statements that Duffy and Fonesca acted in collusion because, according to them, the ensuing investigation did not reveal any facts which would prove that Duffy and Fonesca acted by agreement. The trial court, after hearing argument and examining the pleadings, motions and supporting sub-

missions, granted the defendant's motion for summary judgment on both counts I and II.

OPINION

The dispositive issue is whether the trial court properly granted summary judgment for defendant, implicitly finding that Duffy and Fonesca colluded in perpetrating their fraud, thus limiting the defendant's liability under the terms of the policy to a single, $250,000 payment.

Plaintiffs contend that the trial court erred in granting summary judgment because there is a genuine issue of material fact as to whether Duffy and Fonesca acted in collusion. The plaintiffs argue that the term "collusion," as used in insuring agreement 1A and defined by Black's Law Dictionary, means a secret agreement to defraud another. They urge, therefore, that the evidence did not conclusively show that Duffy and Fonesca agreed to defraud the plaintiffs, but rather permitted an inference that the two men engaged in separate, noncollusive activity. They contend that even if the evidence does inferentially show that Duffy and Fonesca were aware of each other's acts, that inference does not sufficiently establish an agreement to defraud another.

The defendant responds that the trial court's entry of summary judgment was proper in that the undisputed facts established collusion between the two defalcating employees as a matter of law pursuant to the policy language set forth in insuring agreement 1A and section 11. Accordingly, defendant urges that to establish collusion under the policy it is only necessary to show that these employees were concerned or implicated in each other's conduct which caused the plaintiffs' losses, which the undisputed evidence conclusively showed. Defendant contends, therefore, that recovery was limited to $250,000 under the policy's explicit provisions.

■■ An insurance policy should be construed like any other contractual agreement. (*Dotson v. Agency Rent-A-Car, Inc.* (1981), 101 Ill. App. 3d 804, 428 N.E.2d 1002.) Thus, it must be considered in its entirety, and each part of the policy must be construed to be consistent and in harmony with other parts of the policy. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 514 N.E.2d 150.) Accordingly, we must consider the effect of section 11 as it explicitly refers to agreement 1A. Section 11 provides in pertinent part that the defendant's total liability under insuring agreement 1A is limited to $250,000 for all losses caused by any employee or all losses in which an employee is concerned or implicated.

Neither party cited, nor do there appear to be, any Illinois decisions construing the language at issue in the subject policy. However, defendant cites as supportive of its position the case *State Savings Bank v. Hartford Accident & Indemnity Co.*, decided July 8, 1953, by the Tennessee Court of Appeals, (unreported),[1] where the court construed language of an insurance policy somewhat similar to insuring agreement 1A and section 11 of the policy in the instant case. There two bank employees began stealing independently, but began cooperating with one another after each discovered the defalcations of the other. As a result of their efforts, they stole sums of money greatly in excess of the face amount of the fidelity bond. Like the plaintiffs here, the insured claimed the full amount of the bond for each employee, whereas the insurer contended its liability was limited to a single payment of the face amount of the bond, as each employee was concerned or implicated in the acts of the other. The Tennessee Court of Appeals held that the fidelity insuring clause was subject to modification by the language "concerned or implicated" because a contract must be considered in its entirety and not by its isolated parts. Accordingly, the court found that because their acts of cooperation were not limited merely to the covering up of each other's shortages, but so enabled both men to continue stealing, each employee was concerned or implicated in the thefts of the other. The insurer's liability was limited, therefore, to a single payment of the face amount of the bond.

■ We are in agreement with the reasoning of the Tennessee court. A finding of collusion between Fonesca and Duffy does not require that they jointly initiated a common scheme in concert to defraud their employer. Therefore, even if each man began stealing independently, they became sufficiently implicated and concerned in each other's fraud and may be deemed to have acted in collusion with the other when they discovered or became aware of each other's scheme, and overtly assisted, not merely in each other's cover-up, but also in each other's perpetuation of the ongoing fraud. This construction serves to give each of the provisions of the policy its full effect without disparity or distortion.

■ Plaintiffs contend that summary judgment cannot be sustained because the evidence upon which it was predicated is circumstantial and permits more than one inference to be drawn. A motion

---

[1] This case has been cited with approval in *Federal Savings & Loan Insurance Corp. v. Aetna Insurance Co.* (N.D. Ill. 1968), 279 F. Supp. 161, and *SEC v. Arkansas Loan & Thrift Corp.* (W.D. Ark. 1969), 297 F. Supp. 73.

for summary judgment will be granted if the pleadings, admissions and affidavits on file reveal that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005.) If the facts are undisputed, inferences may be drawn from such facts to determine if the defendant is entitled to judgment as a matter of law. (*Fishel v. Givens* (1977), 47 Ill. App. 3d 512, 362 N.E.2d 97.) Summary judgment may well be predicated upon circumstantial evidence so long as such evidence does not permit conflicting inferences to be drawn. (*Cuthbert v. Stempin* (1979), 78 Ill. App. 3d 562, 396 N.E.2d 1197.) However, to preclude summary judgment, such other inferences cannot be unreasonable, speculative or conjectural. (*Consolino v. Thompson* (1984), 127 Ill. App. 3d 31, 468 N.E.2d 422.) The convergence of the undisputed facts and circumstances established that Duffy and Fonesca were each aware of and assisted in the furtherance of the other's defalcations. Any contrary inference from the cumulative data and circumstances would be unreasonable and speculative. It would require the complete suppression and repudiation of ordinary experience and awareness. *Consolino*, 127 Ill. App. 3d at 33, 468 N.E.2d at 424. *Cf. Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505.

It is undisputed that Duffy created the fictitious company, Steelco, to which plaintiffs' funds were diverted. Yet the record also establishes that Fonesca was aware that Steelco was a bogus company and was using Steelco's funds for his personal benefit, while simultaneously assisting Duffy's fraudulent diversion of plaintiffs' funds to Steelco. Both Fonesca and Duffy co-signed numerous Schader checks, dated as early as 1981, and made payable to Steelco. At least one other Schader check, dated January 31, 1983, and made payable to Steelco, bore only Fonesca's signature. One month later, while the Steelco defalcations were still in progress, Duffy wrote a *Steelco* check, dated February 27, 1983, to pay for Fonesca's football tickets, a fact Fonesca knew because it was established that Fonesca remailed the Steelco check and attached it to his handwritten transmittal note to the football club. Less than one month later, Duffy and Fonesca purchased baseball tickets for the 1983 season in a similar manner.

It was also undisputed that one check written on the Steelco account in 1984 and signed by Duffy paid $2,675 to Duffy and Fonesca as joint payees.

The uncontroverted evidence also conclusively linked Duffy to Mass Trans, the fictitious company that plaintiffs contend was wholly engineered by Fonesca. When Fonesca applied for a post office box

for Mass Trans, he listed Duffy as a personal reference. In addition, one Schader check, dated March 21, 1984, and made payable to Mass Trans, was signed by Duffy. Nine days after Duffy wrote and signed that check, he wrote the memo to plaintiffs' president, John Purdy, assuring him that Mass Trans was a legitimate Canadian company and represented that he, himself, took photographs of Mass Trans' equipment being used on a Schader jobsite.

In addition, the evidence was undisputed that, as early as 1981, the time when the defalcations were first committed, Duffy and Fonesca defalcated plaintiffs' funds through their submission for payment of nonbusiness expenses, accomplished by the two employees' mutual approval of the other's expense reports without documentary substantiation as required by company policy. Plaintiffs' claim included an aggregate of more than $165,000 in fraudulent expense account items submitted on behalf of these two employees during the policy period. These expenses included a 1981 travel agency invoice for personal air travel for "J. Duffy/J. Fonesca" and the amounts diverted by Schader checks co-signed by both men to pay for the remodeling of one or both of their private residences.

Given the convergence of the foregoing evidence, to draw the inference, posited by plaintiffs, that Duffy and Fonesca were neither aware that the other was fraudulently diverting plaintiffs' funds nor instrumental in the perpetuation of such defalcations is clearly not reasonable, but rather, pure speculation and conjecture.

Moreover, two of these items of evidence, by themselves, conclusively establish that Duffy and Fonesca collaborated in their efforts to defraud the plaintiffs. Specifically, it was shown that Duffy was inextricably implicated in the Mass Trans scheme, purported to be solely engineered by Fonesca, as it was undisputed that while Duffy was signing checks made payable to Mass Trans, he was simultaneously attesting to the legitimacy of that company and even went so far as to advise Purdy that payment to Mass Trans must be on a cash-on-delivery basis and enclose photographs of Mass Trans' equipment. Moreover, it was not disputed that Duffy and Fonesca knowingly approved the other's expense reports to defalcate plaintiffs' funds for personal expenses. We find, therefore, that the inference that Duffy and Fonesca were aware of and assisted in the furtherance of each other's fraudulent acts is the only inference a fair-minded person could draw from the foregoing uncontroverted evidence. Accordingly, there is no triable issue and the motion for summary judgment should be affirmed. *Peltz v. Chicago Transit Authority* (1975), 31 Ill. App. 3d 948, 335 N.E.2d 74.

Plaintiffs filed two affidavits in opposition to defendant's motion for summary judgment, which they argue raise a genuine issue of material fact as to whether Duffy and Fonesca acted in collusion. The first affidavit was that of Robin Purdy, vice-president of Purdy, the parent company of Schader. In this affidavit, Robin Purdy disclaims his apparent admission in the letter to defendant that Duffy and Fonesca had acted by agreement on the ground that he did not then, nor thereafter, obtain sufficient information upon which to reach that conclusion. The second affidavit was that of John Purdy, president of Purdy, who correspondingly sought to neutralize his admission contained in the letter written to Duffy that Duffy and Fonesca had acted in collusion by characterizing that statement as an accusation, stated only to elicit either an "admission or a denial" from Duffy.

■ In their affidavits, both Purdys merely purport to explain the prior admissions contained in their respective letters; they neither allege any evidentiary facts in support of their affidavits nor expressly deny the otherwise undisputed specific facts pertaining to the conduct of Duffy and Fonesca in defrauding the plaintiffs. These evidentiary facts were documented by the voluminous submissions in support of the defendant's motion for summary judgment, which included the affiants' own letters. Such general denials unsupported by any evidentiary facts are insufficient to raise a triable issue as against uncontroverted evidentiary matter. (See *People ex rel. Highsmith v. County of Jefferson* (1967), 87 Ill. App. 2d 145, 230 N.E.2d 480.) Therefore, each of the underlying facts upon which the motion for summary judgment was predicated remains undisputed, including the fact conceded by plaintiffs that Duffy knowingly approved his and Fonesca's expenses without supporting documentation.

The impact of the totality of all of these facts and circumstances establishes as a matter of law without reasonable contrary inferences a knowing collaboration between Fonesca and Duffy to assist each other in defrauding the company, thereby invoking the provision of the policy limiting liability for collusive conduct among more than one employee.

■ The final question we must consider is whether the trial court abused its discretion in granting summary judgment on count II, which sought attorney fees and costs, pursuant to section 155 of the Insurance Code on the ground that the defendant vexatiously and unreasonably refused to pay the actual loss sustained by plaintiffs. (Ill. Rev. Stat. 1985, ch. 73, par. 767.) The plaintiffs argue that the evidence raises a question of fact as to the good faith of the defendant's conduct. As we have affirmed the entry of summary judgment as to

530

count I, the issue, as framed by count II, whether the defendant acted in bad faith is rendered moot. Accordingly, we affirm the entry of summary judgment as to count II.

For the foregoing reasons, the entry of summary judgment by the circuit court of Cook County is affirmed on both counts.

Affirmed.

COCCIA and MURRAY, JJ., concur.