**PRISCO SERENA STURM ARCHITECTS, LTD., and Security Insurance Company of Hartford, Plaintiffs–Appellees,**

v.

**LIBERTY MUTUAL INSURANCE CO., Defendant–Appellant.**

No. 96–2441.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1997.

Decided Sept. 18, 1997.

Hugh C. Griffin, Diane I. Jennings (argued), William T. Weaver, Daniel A. Cotter, Hugh S. Balsam, Lord, Bissell & Brook, Chicago, IL, Timothy R. Conway, Stein, Ray & Conway, Chicago, IL, for Plaintiffs–Appellees.

Joseph P. Postel (argued), Ana Maria L. Downs, Meachum & Hittle, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and COFFEY and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Torn between the desire to use common forms, which ought to lead to consistent results, and the need to tailor coverage to particular situations, the insurance industry often ends up with policies that are, to put it charitably, convoluted. This has led most

states, including Illinois, to adopt rules requiring policies to be construed in the light most favorable to a finding of coverage, so that people who reasonably think they have insured themselves are not unpleasantly surprised when they submit a claim. *Dora Township v. Indiana Ins. Co.*, 78 Ill.2d 376, 36 Ill.Dec. 341, 343, 400 N.E.2d 921, 923 (1980); *Economy Preferred Ins. Co. v. Grandadam*, 275 Ill.App.3d 866, 212 Ill.Dec. 190, 192, 656 N.E.2d 787, 789 (3d Dist.1995).

The present case involves a coverage dispute between Prisco Serena Sturm Architects, Ltd. (PSSA) and Liberty Mutual Insurance Company (Liberty) over Liberty's duty to defend and to indemnify PSSA for certain work it performed as part of a school construction project. The district court, in a series of orders, granted summary judgment for PSSA and decided that Liberty's long delay in informing PSSA of its refusal to defend entitled PSSA to recover fees, costs, and a penalty under 215 ILCS 5/155 (§ 155). Many of the policy provisions on which Liberty relies are ambiguous and must, therefore, be construed to provide coverage. We find, however, that one provision—the one excluding liability for professional services from coverage—clearly applies to the underlying claim and excuses Liberty from the duty to defend the claim. We therefore also reject the district court's conclusion that PSSA was entitled to an award under § 155.

## I

In comparison to the insurance dispute they engendered, the background facts are quite straightforward. In 1988, the Montessori School of Lake Forest hired PSSA's predecessor to do the architectural work in connection with a new facility it wanted to build in Lake Forest. Under the contract, PSSA had responsibilities for both the design and construction phase of the project. Section 1.5.4 required it to keep the School informed about the progress of the job and to "endeavor to guard" the School against defects and deficiencies in the contractor's work. Under section 1.5.8, PSSA was to issue periodic certificates for payment, which constituted its representations to the School that the work had in fact progressed to the point indicated and that the quality of the work conformed to the contract documents, thereby entitling the contractor to receive payment.

About a year later, the School chose Axelrod Construction Company to be the general contractor on the project. Work proceeded, but not smoothly. In 1992, the School sued Axelrod, Aetna Casualty & Surety Company (Axelrod's surety), and PSSA in the Circuit Court of Lake County, Illinois. The complaint alleged that Axelrod's performance had been unsatisfactory in a number of ways, which had resulted in the following damage to the School: water penetrated the roof, water penetrated and collected in an underground duct system, the system plenums had partially collapsed, mortar joints had suffered shrinkage cracking and horizontal bed joint cracking, a suspended ceiling had collapsed in several areas, a number of tiles were damaged, and an asphalt surface had already begun to deteriorate. Count IV charged that PSSA was responsible for the same damage, because allegedly it had failed to find out that the quality of Axelrod's work did not conform to the contract, it had failed to ascertain that Axelrod's work was not proceeding in accordance with the contract, it had not kept the School correctly informed about the quality of Axelrod's work, and it had failed to guard against defects and deficiencies in Axelrod's performance. Finally, Count V of the complaint alleged that some of PSSA's design documents were faulty, which resulted in damage to the School.

At this point, the insurance dispute takes center stage. Section 11.1.2.1.2e of the School/Axelrod contract (to which we will refer as the construction contract) required Axelrod to procure commercial general liability (CGL) insurance for both the School and for PSSA. That contract also said that the insurance that Axelrod procured had to provide coverage "not less than" the limits stated in the contract. Finally, the contract limited Axelrod's obligation to provide for PSSA's coverage as follows:

> The obligations of the Contractor under the provisions of this article shall not extend to the liability of the Architect, his agents or employees arising out of (1) the

preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs, or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect, his agents or employees, to the extent that such giving or failure to give is the cause of the injury or damage.

Axelrod purchased the required CGL policy from Liberty. The body of the policy is contained in Commercial General Liability Coverage Form CG 00 01 11 88, which near the beginning states that "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations [*i.e.* Axelrod], and any other person or organization qualifying as a Named Insured under this policy." Appended to this general form were a number of special endorsements, several of which are relevant to this appeal. The first was an endorsement entitled "Additional Insured–Engineers, Architects, or Surveyors," numbered CG 20 07 01 87. Part of that form was preprinted, and part of it contained language that was typed in. The preprinted section read as follows:

1. WHO IS AN INSURED (Section II) is amended to include as an insured any architect, engineer, or surveyor engaged by you but only with respect to liability arising out of your premises or "your work" [a defined term].

2. The insurance with respect to such architects, engineers, or surveyors does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" [all defined terms] arising out of the rendering of or the failure to render any professional services by or for you, including:

   a. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and

   b. Supervisory, inspection, or engineering services.

The typed portion of the form added the following to the group of "named insureds":

Any person or organization to whom the Named Insured is obligated by an agreement to provide insurance such as that afforded by this endorsement.

Limits of Liability

It is further agreed that the Limits of Liability with respect to the insurance afforded by this endorsement are not greater than the Limits of Liability required by the terms of any such agreement, but in no event greater than the Limits of Liability stated in Item 3 of the Declarations.

Professional Liability is specifically excluded.

Endorsement CG 20 07 01 87 was not the last word on "WHO IS AN INSURED," however. Also appended to the general policy was another special endorsement, No. CG 20 26 11 85, which was labeled "Additional Insured—Designated Person or Organization." This one, too, amended Section II, "WHO IS AN INSURED," to include "as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you." It was almost entirely typed out, rather than preprinted, and said:

Applies to Location

Any person or organization to whom the Named Insured is obligated by an agreement to provide insurance such as that afforded by this endorsement.

Limits of Liability

It is further agreed that the Limits of Liability with respect to the insurance afforded by this endorsement are not greater than the Limits of Liability required by the terms of any such agreement, but in no event greater than the Limits of Liability stated in Item 3 of the Declarations.

Endorsement CG 20 10 11 85 was almost identical to CG 20 26 11 85, except it was labeled "Additional Insured—Owners, Lessees or Contractors (Form B)."

One final detail of the general policy is relevant to the parties' arguments here. It contained a rather long list of exclusions, which included one for " 'property damage' to 'your product' arising out of it or any part of it." Exclusion (k). Section V of the policy defined the terms used in the policy such as "occurrence," "property damage," and "your

product." We refer to those definitions as needed in our discussion.

## II

The district court issued a series of opinions which, in the aggregate, explain the judgment before us. See 1995 WL 417531 (N.D.Ill.) (denying Liberty summary judgment on PSSA's duty to defend claim); 1995 WL 729292 (N.D.Ill.) (denying Liberty's second motion on the duty to defend claim and granting PSSA's motion on the same); 1996 WL 167323 (N.D.Ill.) (denying Liberty summary judgment on PSSA's claim that Liberty's actions violated § 155); and 1996 WL 288777 (N.D.Ill.) (granting PSSA summary judgment on § 155 claim). Rather than rehearsing the details of each one of these, we move directly to Liberty's reasons for urging that it had no duty to defend PSSA under the policy. We review *de novo* the district court's decision to grant summary judgment, *Bagdonas v. Dept. of Treasury*, 93 F.3d 422, 425 (7th Cir.1996), as well as its finding of ambiguity with respect to the duty to defend (which triggered the rule requiring construction in favor of the insured).

Liberty offers three principal arguments for reversal, any one of which would require a ruling in its favor. First, it claims that because the complaints alleged property damage only to the building itself, not to other property, they did not allege property damage caused by an "occurrence" within the meaning of the policy. Second, it argues that the "own product" exclusion of the policy, exclusion (k), applies here to exclude coverage for property damage to the building itself. Third, it argues that the policy had a professional services exclusion that operated to exclude coverage for PSSA, because all of the allegations against it pertained to its professional services. In addition, Liberty argues that no matter how the coverage dispute is resolved, the district court should not have applied § 155 to this situation. We consider these points in turn, bearing in mind that the only question is whether the underlying complaint alleges facts that fall within, or even potentially within, the coverage of the policy. *Wilkin Insulation*, 161 Ill.Dec. at 284, 578 N.E.2d at 930; *Outboard Marine*

*Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 699, 607 N.E.2d 1204, 1212 (1992); *Hurst–Rosche Eng'rs, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir.1995). We also must construe the policy liberally in favor of the insured, resolving all ambiguities in favor of the insured. *Economy Preferred*, 212 Ill.Dec. at 192, 656 N.E.2d at 789; *Dora Township*, 36 Ill.Dec. at 342, 400 N.E.2d at 922.

### A. *Was there an "occurrence"?*

Section V, ¶ 9, of the policy defined the term "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." As both parties agree that Illinois law governs the policy at issue in this diversity case, we turn immediately to that law for guidance in interpreting this contract. Liberty argues that Illinois courts have held that construction defects cannot, in themselves, constitute an "occurrence" within the meaning of an insurance policy like this one. To support its position, Liberty relies on *Charles H. Eichelkraut and Sons, Inc. v. Bituminous Cas. Corp.*, 166 Ill.App.3d 550, 117 Ill.Dec. 13, 519 N.E.2d 1180 (1st Dist.1988); *Diamond State Ins. Co. v. Chester–Jensen Co.*, 243 Ill.App.3d 471, 183 Ill.Dec. 435, 611 N.E.2d 1083 (1st Dist.1993); *Indiana Ins. Co. v. Hydra Corp.*, 245 Ill.App.3d 926, 185 Ill.Dec. 775, 615 N.E.2d 70 (2d Dist.1993); and *Monticello Ins. Co. v. Wil–Freds Constr., Inc.*, 277 Ill.App.3d 697, 214 Ill.Dec. 597, 661 N.E.2d 451 (2d Dist.1996).

In *Charles H. Eichelkraut*, the Illinois Appellate Court found no duty to defend because "the occurrence causing the damage was the faulty workmanship itself, as distinguished from an 'accident' that occurred following construction...." 117 Ill.Dec. at 16–17, 519 N.E.2d at 1183–84. *Diamond State* involved a claim relating to a faulty air conditioning system installed in the State of Illinois Center in Chicago. That court described an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." 183 Ill.Dec. at 443, 611 N.E.2d at

1091. The mere failure of the air conditioning system to perform as warranted was not an accident in this sense of the term, and so the court concluded that the insurer had no duty to defend. *Hydra Corp.* again stressed the need for an accident, and thus an "occurrence," to be something unforeseen, "usually of an untoward or disastrous character or an undesigned sudden or unexpected event of an inflictive or unfortunate character." 185 Ill.Dec. at 778, 615 N.E.2d at 73. *Wil–Freds* followed *Hydra Corp.* in concluding that the construction defects in the building at issue in that case were the "natural and ordinary consequences" of the improper construction techniques, which meant that coverage had to be denied. 214 Ill.Dec. at 602, 661 N.E.2d at 456.

PSSA responds in two ways: first, it argues that all four of these cases involve claims against the contractor for its own workmanship, not claims against an additional insured for negligence in not discovering the defects; second, it asserts that the Illinois Supreme Court's decision in *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991) governs here. The question in *Wilkin Insulation* was whether various insurers had a duty to defend against claims for property damage allegedly caused by a general contractor's installation of asbestos insulation in school buildings. The policy defined "occurrence" very similarly to the way it had been defined in the appellate court cases cited by Liberty and the way it was defined here; namely, as "an accident, including continuous or repeated exposure to conditions which results in property damage ... neither expected nor intended from the standpoint of the insured." 161 Ill.Dec. at 286, 578 N.E.2d at 932. The court found that "the continuous exposure of the buildings and their contents to released asbestos fibers" amounted to an "accident" that resulted in "property damage," as defined by the policies. The fact that Wilkin intentionally installed the asbestos did not take its actions out of the policy because the court found that it was the contamination of the building that had to be unintentional and unexpected. Finding no hint in the complaint that Wilkin expected or intended to contaminate the building with toxic fibers, the court found a duty to defend.

The claims against PSSA included allegations that its negligence in uncovering the defective work and its negligent certifications resulted in the incorporation of defective components into the building. The suit therefore tried to hold PSSA liable for the many defects in the building on the theory that its repeated negligent acts caused the harm to the School. From the School's perspective, this was "continuous or repeated exposure to substantially the same general harmful conditions," that is, PSSA's allegedly careless or negligent oversight of the job. We agree with PSSA that this is very much like the situation in *Posing v. Merit Ins. Co.*, 258 Ill.App.3d 827, 196 Ill.Dec. 335, 629 N.E.2d 1179 (3d Dist.1994), where a termite inspector was accused of negligently performing an inspection for the presence of those pests. His carelessness led to later termite damage to the claimants' homes. When they sued, the insurer argued that there was no "occurrence," because there had been no "accident." The court held that the inspector's negligence qualified under the policy and found a duty to defend.

We agree with PSSA that the fact that it was not the party actually performing the construction work distinguishes this case from those on which Liberty relies. Insofar as the complaint was concerned, PSSA's role was that of inspector and certifier. Its negligence in performing that role prevented the School from discovering the faulty construction work, just as the termite inspector in *Posing* prevented his clients from detecting the presence of the termites. The complaint governs our consideration here. See *Wilkin Insulation*, 161 Ill.Dec. at 284, 578 N.E.2d at 930. It does not allege that PSSA intentionally overlooked Axelrod's shortcomings or that it expected to miss them or to certify payments that were not due. Under *Wilkin Insulation* and *Posing*, therefore, we conclude that the complaint here alleged an "occurrence" within the meaning of the Liberty policy.

**B.** *Was this damage to PSSA's or Axelrod's "own product"?*

■ The question here turns on the meaning of exclusion (k) in the policy, which ex-

cludes from coverage " 'property damage' to 'your product' arising out of it or any part of it." Liberty argues that the term "your product" here can mean only the building that Axelrod was constructing. The "damage" to the building for which PSSA was allegedly responsible arose out of that same product, in Liberty's view; thus, it says, the exclusion applies.

The word "your" in the Liberty policy does not refer only to Axelrod, according to the introductory paragraph quoted above. It can also include "any other person or organization qualifying as a Named Insured under the policy," such as PSSA. PSSA's "product" here was really a package of services. The underlying action alleges damages to *Axelrod*'s product (the building) by PSSA's negligent misrepresentations about Axelrod's work; there is no allegation that PSSA's drawings, designs, and architectural work caused the damage. In addition, as PSSA has noted, the term "your product" does not include real property. The policy defines "your product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by you." Section V, ¶ 14. Thus, even if we were to consider "your product" to be the building Axelrod was constructing, as Liberty urges, if that building is real property, exclusion (k) would be inapplicable by its terms.

As long as PSSA is a Named Insured, it would be possible both to find that it is covered but that its "product" is not the same as Axelrod's. Construing the policy favorably to the insured, as we must, PSSA is covered. Three endorsements amplify the list of "who is insured": endorsement CG 20 07 01 87, endorsement CG 20 26 11 85, and endorsement CG 20 10 11 85, all of which we described above. Each of them contains roughly this language: "Any person or organization to whom the Named Insured is obligated by an agreement to provide insurance such as that afforded by this endorsement." The original Named Insured, Axelrod, was obligated by its agreement with the School to provide CGL coverage for PSSA, in section 11.1.2.1.2e of the construction contract. This is enough, as the district court held, to bring PSSA under the policy as a Named Insured.

It does not resolve the question whether all types of liability that might be asserted against PSSA are covered, because exclusions might preclude some claims (as they would even for Axelrod, of course). It does mean, however, that PSSA has shown for present purposes that it occupies the middle ground we described above, of qualifying as a Named Insured but avoiding the "own product" exclusion.

### C. *Is PSSA's claim barred by a professional services exclusion?*

■ Liberty's final argument is the only one we find persuasive—that PSSA's claim is barred by the professional services exclusion in the policy. Liberty points out that the Axelrod/School contract did not require Axelrod to provide for PSSA's professional liability coverage for "(1) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs, or specifications, or (2) the giving of or the failure to give directions or instructions by the Architect, his agents or employees, to the extent that such giving or failure to give is the cause of the injury or damage." This is true, but what matters for purposes of deciding whether Liberty has a duty to defend is what the insurance policy says. Here, too, Liberty has strong support for its position. Endorsement CG 20 07 01 87 ends with a specific typewritten statement saying that "professional liability is specifically excluded." That endorsement is the part of the policy that most specifically addresses professional services. To reiterate, it says that "insurance with respect to ... architects ... does not apply to ... 'property damage' ... arising out of the rendering of or the failure to render any professional services by or for you, including: (a) the preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; and (b) supervisory, inspection, or engineering services." Taking all of this together, Liberty argues that PSSA's negligence in performing the oversight and certification services called for in its contract with the School must have been excluded from the policy.

CGL coverage and professional services coverage serve significantly different functions within the insurance industry. CGL, as the name suggests, provides comprehensive coverage, while a professional services policy is "designed to insure members of a particular professional group from the liability arising out of a special risk ... inherent in the practice of the profession." *Management Support Assocs. v. Union Indem. Ins. Co.*, 129 Ill.App.3d 1089, 85 Ill.Dec. 37, 41, 473 N.E.2d 405, 409 (Ill.App.Ct., 1st Dist.1984) (internal citations omitted). PSSA had a professional liability insurance (provided by Security Insurance, the intervenor here), which was designed to insure the risks attendant to its architectural services. That fact alone, of course, would not win the day for Liberty if the CGL policy could be construed to cover the same risks. It may prevail only if the policy unambiguously excludes coverage of the claims against PSSA in the underlying suit.

Earlier Illinois cases such as *Posing* show that CGL insurance may cover the provision of services in general. Thus, the fact that PSSA was rendering "services" in its supervision of the project work and its certifications of Axelrod's requests for payment is immaterial. PSSA is wrong, however, to argue that the CGL coverage it was promised in the construction contract would be a nullity if the policy is construed to exclude its professional services. Liberty pointed out at oral argument that Axelrod's promise to secure CGL coverage for PSSA had some meaning even if it did not cover the claims the School has brought. For example, if someone entering PSSA's trailer at the construction site were to slip and fall and then file an injury claim against PSSA, Liberty's CGL policy would provide coverage. Similarly, were a PSSA employee to leave a coffee pot on after departing for the day, resulting in a fire that caused damage to the construction project, claims based on that occurrence would be covered by the CGL policy.

The key once again is the language of the policy. The professional services exclusion specifically refers to "any architect, engineer or surveyor engaged by *you*." (Emphasis added.) Endorsement 20 07 01 87. As discussed above, the policy states right at the beginning that "the words 'you' and 'your' refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy." Endorsement 20 07 01 87, like endorsements 20 26 11 85 and 20 10 11 85, adds "any person or organization to whom the Named Insured is obligated by an agreement to provide insurance such as that afforded by this endorsement." Axelrod, the Named Insured, was obligated to include both PSSA and Montessori as additional insureds on its CGL policy. Therefore, the entire CGL policy must apply to each of them just as it applies to Axelrod.

PSSA argues that the professional liability exclusion is not applicable to claims against it because it was not "engaged by" Axelrod. This ignores the fact that PSSA was "engaged by" Montessori. Since Montessori is an additional insured under the policy, it is a "you" for purposes of the exclusion, as well as for the rest of the CGL policy. Thus, PSSA was "engaged by" an insured party. Both the specific language of endorsement CG 20 07 01 87, ¶ 2, and the typed addendum to that endorsement, make it clear that professional liability coverage is excluded for the kind of architectural service described in the complaint. We think it strains the policies beyond the breaking point to read such coverage back in through the general language of endorsements CG 20 26 11 85 and CG 20 10 11 85, which address only the limits of liability. Liberty was therefore entitled to summary judgment on its claim that it was not required to defend PSSA against the underlying suit.

### D. *Does § 155 apply here?*

The most important question remaining is whether § 155 applies here. If it does, Liberty can prevail only if the district court abused its discretion in awarding fees and penalties. The statute allows attorneys' fees and penalties when an insurance company's denial of a claim or delay in settling a claim is "vexatious and unreasonable." 215 ILCS 5/155. Liberty offers two reasons why it should not apply: first, it argues that § 155

is a penal statute and should be narrowly construed to apply only to first-party insurance, not to third-party insurance like the policy here; and second, it argues that a victory on the main claim automatically disqualifies PSSA from a recovery under § 155.

One district judge has accepted Liberty's first argument. See *California Union Ins. Co. v. Liberty Mut. Ins. Co.*, 920 F.Supp. 908, 920 (N.D.Ill.1996). This position is not, however, reflected in any Illinois decisions construing § 155. To the contrary, Illinois courts have rejected the claim that § 155 does not apply to third-party insurance and claims for defense. See, e.g., *Richardson v. Illinois Power Co.*, 217 Ill.App.3d 708, 160 Ill.Dec. 498, 500, 577 N.E.2d 823, 825 (5th Dist.1991); *Sprayregen v. American Indem. Co.*, 105 Ill.App.2d 318, 245 N.E.2d 556 (1st Dist.1969). Like them, we read the unrestricted language of the statute to make it generally applicable to third-party as well as first-party insurance.

The second point is somewhat more difficult. As the Illinois Appellate Court observed in *Weeks v. Aetna Ins. Co.*, 150 Ill. App.3d 90, 103 Ill.Dec. 328, 329, 501 N.E.2d 349, 350 (2d Dist.1986), prior to a 1977 amendment to § 155 it would have been clear that Liberty's victory on the principal claim also disposed of the § 155 claim. But in 1977, the statute was amended, and the General Assembly specifically deleted the language limiting recovery to a "prevailing party." See Act of Sept. 20, 1977, P.A. 80–814. The *Weeks* court found it unnecessary to decide whether the change in language had the effect of deleting the former requirement. Other courts have refused to grant relief under the post-amendment version of the statute, one finding that the plaintiffs' failure to succeed rendered the request moot, *Purdy Co. v. Transportation Ins. Co.*, 209 Ill.App.3d 519, 154 Ill.Dec. 318, 324, 568 N.E.2d 318, 324 (1st Dist.1991), and another stating that plaintiffs have no claim under § 155 unless they can show that they had a legitimate claim for coverage under their policy, *Purlee v. Liberty Mut. Fire Ins. Co.*, 260 Ill.App.3d 11, 197 Ill.Dec. 430, 445, 631 N.E.2d 433, 448 (5th Dist.1994). See also *Perfection Carpet, Inc. v. State Farm Fire &* *Cas. Co.*, 259 Ill.App.3d 21, 197 Ill.Dec. 28, 630 N.E.2d 1152 (1st Dist.1994).

We do not condone Liberty's sloth in responding to PSSA's request for a defense. PSSA tendered its defense to Liberty in November 1992. Trial on the underlying claim was set for March 1994, yet Liberty did not formally communicate its denial of coverage to PSSA until *April* 1994, a year and a half after tender and a month after the trial was set. Even then, Liberty did not write directly to PSSA, but instead sent a letter to Axelrod. Only after PSSA wrote again, nearly two years after its original inquiry, did Liberty bother to respond directly to it. Nevertheless, as both *Purdy* and *Purlee* indicate, a remedy under § 155 is not available here for PSSA. The *Purdy* court evidently accepted Liberty's position that the amendment did not change the substance of Illinois law on this point; *Purlee* (perhaps in dicta) required a preliminary showing of a legitimate claim for coverage. As we have shown, PSSA has not made such a showing here. We caution insurance companies, however, that they play a high stakes game of poker when they proceed as Liberty did. Given the strong Illinois rule in favor of construing all ambiguities for the insured, an insurer could well find itself not only paying the costs of a defense, but also the additional § 155 penalties if it dragged its feet as Liberty did.

For the foregoing reasons, we REVERSE the district court's order granting summary judgment for PSSA, and its order denying summary judgment for Liberty; we also REVERSE its order awarding fees and penalties to PSSA under 215 ILCS 5/155.