**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 22 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

CONTINENTAL CASUALTY COMPANY,

    Plaintiff-Counter-Defendant,

v.

CHARLES HEMPEL,

    Defendant-Appellant and Cross-
    Appellee,

and

PATRICK L. WESTERFIELD, as Personal
representative of the Estate of Frank O.
Westerfield, Jr., deceased,

    Defendant-Third Party Plaintiff-Counter-
    Defendant-Appellant and Cross-
    Appellee,

v.

INSURANCE COMPANY OF NORTH
AMERICA,

    Third-Party-Defendant-Counter
    Defendant-Counter Claimant-Third
    Party Plaintiff-Appellee and Cross-
    Appellant,

v.

HARTFORD ACCIDENT & INDEMNITY
COMPANY; UNITED STATES FIRE
INSURANCE COMPANY; ST. PAUL FIRE

Nos. 97-2136, 97-2147
(D.C. No. CIV-94-412-
JC/WWD)
(D. N.M.)

AND MARINE INSURANCE COMPANY,

       Third Party Defendants-Counter
       Defendants-Counter Claimants-
       Third Party Plaintiffs,

v.

ROY AND VIRGINIA TAUCHE REVOCABLE
LIVING TRUST; FRANCIS M. GRAHAM
REVOCABLE TRUST; ROXANNE GRAHAM
IRREVOCABLE TRUST; ROXANNE
GRAHAM REVOCABLE TRUST; THOMAS
TAUCHE IRREVOCABLE TRUST; WALTER
TAUCHE IRREVOCABLE TRUST; THOMAS
TAUCHE, only to the extent of any interest as a
Beneficiary and/or as Trustee of one or more of
named Trusts; ROY TAUCHE, only to the
extent of any interest as a Beneficiary and/or as
Trustee of one or more of the Trusts;
VIRGINIA TAUCHE, only to the extent of any
interest as a Beneficiary and/or as Trustee of
one or more of the Trusts; ROXANNE
GRAHAM, only to the extent of any interest as
a Beneficiary and/or as Trustee of one or more
of the Trusts; WALTER TAUCHE, only to the
extent of any interest as a Beneficiary and/or as
Trustee of one or more of the Trusts,

       Third-Party Defendants-Counter
       Defendants.

_____

CONTINENTAL CASUALTY COMPANY,

       Plaintiff-Counter-Defendant-Appellee,

v.

2

CHARLES HEMPEL,

      Defendant-Appellant and Cross-
      Appellee,

and

PATRICK L. WESTERFIELD, Representative
of the Estate of Frank O. Westerfield, Jr.,
deceased,

      Defendant-Third-Party-Plaintiff-Counter
      Defendant-Appellant and Cross-
      Appellee,

v.

HARTFORD ACCIDENT & INDEMNITY
COMPANY; INSURANCE COMPANY OF
NORTH AMERICA; UNITED STATES FIRE
INSURANCE COMPANY,

      Third-Party-Defendants-Counter
      Defendants-Counter Claimants-
      Third-Party Plaintiffs,

v.

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY,

      Third-Party-Defendant-Counter
      Defendant-Counter Claimant-Third-Party
      Plaintiff-Appellee and Cross-Appellant,

v.

ROY AND VIRGINIA TAUCHE REVOCABLE

Nos. 97-2190, 97-2194,
97-2195
(D.C. No. CIV-94-412-
JC/WWD)
(D. N.M.)

LIVING TRUST; FRANCIS M. GRAHAM REVOCABLE TRUST; ROXANNE GRAHAM IRREVOCABLE TRUST; ROXANNE GRAHAM REVOCABLE TRUST; THOMAS TAUCHE IRREVOCABLE TRUST; WALTER TAUCHE IRREVOCABLE TRUST; THOMAS TAUCHE, only to the extent of any interest as a Beneficiary and/or as Trustee of one or more of named Trusts; ROY TAUCHE, only to the extent of any interest as a Beneficiary and/or as Trustee of one or more of the Trusts; VIRGINIA TAUCHE, only to the extent of any interest as a Beneficiary and/or as Trustee of one or more of the Trusts; ROXANNE GRAHAM, only to the extent of any interest as a Beneficiary and/or as Trustee of one or more of the Trusts; WALTER TAUCHE, only to the extent of any interest as a Beneficiary and/or as Trustee of one or more of the Trusts,

Third-Party-Defendants-Counter Defendants.

---

**ORDER AND JUDGMENT** *

---

Before **HENRY** , **HOLLOWAY** , and **BALDOCK** , Circuit Judges.

---

Continental Casualty Company (CNA) filed this action seeking a

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

declaratory judgment that it had no obligation to indemnify one of its insureds, Frank O. Westerfield, Jr. (Mr. Westerfield), on a New Mexico state court judgment. CNA alleged that the judgment arose out of a collusive settlement between Mr. Westerfield and Mr. Charles Hempel. Mr. Hempel was the plaintiff in the state court proceedings against Mr. Westerfield.

As personal representative of his father's estate, Patrick Westerfield responded to CNA's allegations by filing counterclaims for bad faith denial of coverage against CNA and five other insurers. He also filed a claim against the Insurance Company of North America (INA), alleging that his father was entitled to coverage for part of the state court judgment on the basis of a professional liability policy issued by that insurance company for the period from 1968 to 1969.

The insurers then filed crossclaims against Messrs. Hempel and Westerfield. In its crossclaim, St. Paul Fire and Marine Insurance Company (St. Paul) alleged that the two men had fraudulently induced it into paying $300,000 to Mr. Hempel under one of the policies it had issued to Mr. Westerfield.

In a series of decisions, the district court ruled as follows: (1) it granted summary judgment to the insurers on their claim that the state court judgment was collusive and that, as a result, the subject policies did not provide coverage for that judgment, see Continental Casualty Co. v. Westerfield, 961 F. Supp. 1502 (D.

5

N.M. 1997); (2) it granted summary judgment in favor of Messrs. Westerfield and Hempel and against St. Paul on St. Paul's fraud claim to recover the $300,000 that it had paid to Mr. Hempel; (3) it granted summary judgment in favor of INA and against Mr. Westerfield on Mr. Westerfield's claim that he was entitled to coverage under the 1968-69 professional liability policy.

The losing parties as to all three of those rulings have now appealed. For the reasons set forth below, we affirm the district court's decisions.

## I. BACKGROUND

### A. The state court case

The underlying state court action began in the Travis County, Texas probate court following the death of Mr. Hempel's mother, Ada Mudge, in 1991. The dispute concerned Ada Mudge's rights under the will of her late husband Daniel Mudge, who died in 1959. The principal asset of Mr. Mudge's estate was 23,400 shares of common stock in what later became the Tandy Corporation.

Daniel Mudge's will directed his estate to be divided between Ada Mudge and Mr. Mudge's two daughters from a previous marriage, Francis Graham and Virginia Tauche. The will appointed Eugene Graham, Mr. Mudge's son-in-law as executor, directed him to establish two trusts (an "Annuity Trust" and a "Residuary Trust"), and appointed Mr. Graham as trustee.

6

Under the will, the Annuity Trust was to be funded with one third of "any and all stocks, bonds, and like securities of every nature and description." Aplts' App. (case nos. 97-2190, 2194, 2195) vol. VIII, at 2342. The will directed the trustee to pay to Ada Mudge during her lifetime "all income as may be derived from the dividends from such securities." Id. The Residuary Trust was to be funded with "the rest, residue, and remainder" of the estate. Id. The will directed the trustee to pay to Ada Mudge, Francis Graham, and Virginia Tauche one-third of the rents and profits from the Residuary Trust during Ada Mudge's lifetime.

Eugene Graham did not comply with the terms of the will. Rather than creating two trusts and designating Ada Mudge as a life beneficiary, he created only one trust and distributed two-thirds of the stock held by the estate to the two daughters. He also converted 5,000 of the 7,800 shares of remaining stock into debentures.

Mr. Graham died in 1964, and the Bernallilo County, New Mexico District Court appointed First National Bank of Albuquerque (the Bank) as the successor trustee. The court appointed Mr. Westerfield as the attorney for the trust. Eventually, in Feburary 1976, the Bank created two trusts—the Annuity Trust and the Residuary Trust. See id. at 2354.

Following Ada Mudge's death in 1991, the Bank filed a petition seeking instructions regarding the proper distribution of the Annuity Trust and Residuary

7

Trust assets. The case was transferred to the Bernallilo County District Court. Mr. Hempel responded to the Bank's petition and asserted counterclaims and crossclaims against the Bank, Mr. Westerfield, Francis Graham, and the estate of Virginia Tauche. Mr. Hempel alleged that these parties had participated in the wrongful appropriation of trust assets in contravention of Daniel Mudge's will. He asserted claims for breach of fiduciary duty, negligence, gross negligence, tortious interference, fraud, conversion, legal malpractice, breach of contract, and prima facie tort. He also asserted various equitable claims seeking an accounting of the trust assets and a return of property to Ada Mudge's estate.

Mr. Hempel's allegations against Mr. Westerfield encompassed a period of more than twenty-five years, from before Eugene Graham's death in 1964 until 1991. According to Mr. Hempel, Mr. Westerfield knew about Eugene Graham's misappropriation of trust assets before the court appointed him as attorney for the trust, but he failed to inform Ada Mudge, thereby breaching his duty to her as a beneficiary. Subsequently, Mr. Westerfield filed petitions with the court without notice to Mrs. Mudge. Mr. Hempel alleged that these petitions distorted the terms of the trusts and led the court to authorize distributions of trust assets inconsistent with the terms of the will. Mr. Hempel further maintained that on several occasions Mr. Westerfield sent Mrs. Mudge misleading waivers and releases that purported to surrender any future claims for money from the trusts. According to

8

Mr. Hempel, Mr. Westerfield persuaded Mrs. Mudge to sign these waivers and releases in exchange for additional distributions from the trusts. These documents did not inform Mrs. Mudge of her actual rights under the trusts.

Mr. Westerfield had insurance coverage with various insurers, including CNA, St. Paul, Home Insurance Company (Home), and Ranger Insurance Company (Ranger). He requested the insurers to provide a defense to Mr. Hempel's lawsuit.

Home and St. Paul agreed, but CNA refused to provide coverage. CNA maintained that the Mr. Hempel's allegations fell within its policies' exclusions for "dishonest, fraudulent, criminal, or malicious act[s] or omission[s]." See Aplts' App. (case nos. 97-2190, 2194, 2195) vol. VI, at 1646. As to one of its policies, CNA further maintained that there was no coverage because Mr. Hempel's action had not been filed within "fifteen years of the end of the annual policy period, in which the act, error or omission occurred." Id.

In a separate ruling that is not directly at issue in these appeals, the federal district court concluded that CNA breached its duty to defend Mr. Westerfield. The court reasoned that Mr. Hempel had made allegations that "could be categorized as either fraudulent wrongdoing, excluded from coverage . . . , or professional negligence, an insurable risk." Id. vol. I, at 262. It noted that Mr. Hempel had asserted claims for negligence, gross negligence, legal malpractice,

9

and breach of contract and that his factual allegations comported with those legal theories.

Home retained Briggs Cheney to represent Mr. Westerfield in the Hempel litigation. After conducting discovery, Mr. Cheney concluded that "[t]here clearly exist circumstances which I believe can create liability for Mr. Westerfield, the bank, and the daughters and I think the court will so find." Aplts' App. (case nos. 97-2190, 2194, 2195) vol. VI, at 1625. To Mr. Cheney, the central issue in the case was the determination of the amount of damages to which Ada Mudge's estate was entitled and the determination of which parties should be held responsible for them.

The damages issue turned on the interpretation of Daniel Mudge's will. As noted above, the will provided that, during her lifetime, Ada Mudge was entitled to "all income as may be derived from the dividends from . . . securities" held in the Annuity Trust and one-third of the "rents and profits" from the Residuary Trust. See Aplt's App. (case nos. 97-2190, 2194, 2195) vol. VIII, at 2342. Since Daniel Mudge's death in 1959, the primary trust asset—the Tandy Corporation shares— had multiplied through various stock dividends and stock splits, and the formation of subsidiary entities that had also issued stock splits. The question for the parties was whether these various stock dividends, stock splits, and stock spinoffs should be treated as "income . . . derived from the dividends from . . .

10

securities" and "rents and profits," id.—to which Ada Mudge's estate would be entitled—or alternatively, as principal (i.e., part of the trust corpus)—to which the daughters would be entitled.

The parties consulted experts who reached contrasting conclusions as to the value of Ada Mudge's rights in the trusts. Mr. Hempel's attorney, John McKetta, first considered the calculations of a Texas accountant named Thomas Glass. Mr. Glass had determined that assets to which Ada Mudge was entitled under the Annuity Trust and Residuary Trust approximated $17,600,000. Mr McKetta also considered alternative calculations using assumptions more favorable to Mrs. Mudge's rights (e.g., that the first trustee had wrongfully converted 5,000 shares of stock to which Mrs. Mudge was entitled). Under these alternative calculations, Mrs. Mudge's estate was entitled to $27,964,836 in trust assets. Aplts' App. (case nos. 97-2190, 2194, 2195) vol. III, at 645.

Then, in 1993, Mr. McKetta retained another expert, New Mexico accountant Thomas Gilmore. Mr. Gilmore developed a series of alternative scenarios concerning the rights of Ada Mudge's estate in the trusts. The scenarios varied in their treatment of stock dividends, splits, and spinoffs. Under Mr. Gilmore's scenarios, the amounts to which the estate was entitled ranged from $3,711,837 to $35,936,566. Id. at 648.

In contrast, Mr. Cheney consulted experts who arrived at a much lower

11

valuation of Mrs. Mudge's interest in the two trusts. In defending Mr. Westerfield, Mr. Cheney was able to identify New Mexico legal authorities that provided substantial support for the theory that the stock splits were generally treated as principal under New Mexico's statutory law. He contacted experts who agreed to testify at trial that treatment of the stock splits as principal was warranted.

In light of this information, Mr. Cheney advised Home that Mr. Hempel was severely overvaluing his claims. He reported that his own defense expert had calculated damages in a range of "a best case basis of approximately $443,000 and a worst case basis of $2.8 million." Aplts' App. (case nos. 97-2190, 2194, 2195) vol. VI, at 1696. Mr. Cheney stated that Mr. Hempel was incorrect in arguing that splits and dividends constituted items of income payable to Ada Mudge and that he believed that Mr. Westerfield would prevail on that point at trial. Mr. Cheney also stated that Mr. Westerfield could argue that, to the extent that Ada Mudge had been injured by the misappropriation of trust assets, the damages should be paid by the two daughters, because they had received the profits and earnings that should have gone to her.

## B. The agreement not to execute on Mr. Westerfield's assets

12

In the months preceding the March 1994 trial, the parties engaged in extensive settlement negotiations. In November 1993, Mr. Hempel made a global settlement demand of $5.5 million in exchange for a release of all claims against all parties–the Bank, Mr. Westerfield, the two daughters, and the two daughters' trusts. That settlement offer was not accepted.

About a week before the trial, Mr. Westerfield hired another attorney, Floyd Wilson, as personal coverage counsel. At that point, Mr. Wilson and Mr. Hempel's attorney, Mr. McKetta, began to discuss the idea of agreeing to an uncontested trial. In particular, Mr. Wilson and Mr. McKetta discussed a settlement plan under which, in exchange for cash payments to Mr. Hempel by certain of Mr. Westerfield's insurers, those insurers would be released from any further obligations under their policies, but Mr. Westerfield would not obtain a release of his liability to Mr. Hempel. Instead, Mr. Hempel would be permitted to proceed with his claims against Mr. Westerfield. Mr. Westerfield would receive a covenant not to execute upon his personal assets and would assign his claims against any insurer unwilling to participate in the settlement. As a result of this assignment, Mr. Hempel could attempt to recover from Mr. Westerfield's insurers the judgment that he obtained in the state court trial against Mr. Westerfield. Mr. Wilson and Mr. McKetta also discussed the possibility of an agreement under which Mr. Westerfield would retain a ten percent interest in the recovery from the

13

bad faith actions.

Around March 15, 1994, Mr. Wilson and Mr. McKetta entered into a written settlement agreement on behalf of their clients. Under the agreement, Mr. Hempel executed a covenant not to execute on a judgment against Mr. Westerfield, although he did not agree to release Mr. Westerfield from liability. Mr. Westerfield assigned to Mr. Hempel 90% of the proceeds of the bad faith lawsuit that Mr. Westerfield agreed to pursue against the non-settling insurers after the entry of judgment in the state court.

Mr. Cheney explained the agreement to his client in the following terms:

> By this settlement, we have tacitly agreed not to defend the action. In fact, it is not necessarily in your best interests to do so as it may impact negatively on subsequent actions against non-settling or non-participating Westerfield professional liability insurance carriers . . . .
> . . . it is understood that I will not actively defend you in this matter. I am operating on your instructions not to actively defend . . . To that end, <u>I . . . will not take actions to minimize any judgment which may be entered.</u>

Aplts' App. (case nos. 97-2190, 2194, 2195) vol. VI, at 1684; <u>see also</u> CNA Br. in Chief at 8 (emphasis added).

After negotiating the agreement, Mr. Hempel settled claims against both the Bank (for $1,150,000) and against the Mudges' two daughters ($650,000 for both of them). The daughters agreed not to take an active role in the state court trial.

Mr. Hempel's and Mr. Westerfield's lawyers also explored settlement of claims pursuant to specific insurance policies.  In particular, on March 15, 1994, Mr. McKenna sent the following letter to Mr. Cheney:

> Dear Briggs,
>
> > Hempel offers to settle with Westerfield for the coverage year time period afforded by the Ranger policy for $1,000,000–well under the $5 mm policy limits, This offer expires 5 p.m. Th. 3-17-94
>
> > Mike McKetta
> > 7 p.m. 3-15-94

Aplts' App. (case nos. 97-2190, 2194, 2195) vol. II, at 457.

Mr. Cheney conveyed this note to the Ranger (which had issued an excess liability policy to Mr. Westerfield in the amount of $5,000,000 for the period of December 5, 1975 through January 5, 1977).  Initially, Ranger proposed a counteroffer of $500,000.  However, on March 17, 1994, Ranger agreed to pay the $1,000,000 sum that Mr. McKetta had demanded in the March 15, 1994 letter.

On March 18, 1994, Mr. McKetta made a written $300,000 settlement offer to St. Paul in the following terms:  "[t]his settlement demand is made on behalf of Hempel to settle claims against Westerfield to the extent of coverage under the following St. Paul policies for payment of the amounts indicated: (1) 583JE7440 $300,000."  Id. at 459.  Mr. McKetta said that the offer would expire on March

15

21, 1994. St. Paul accepted the offer and agreed to pay $300,000 to Mr. Hempel on the policy. The parties entered into a formal agreement on March 21, 1994. Apparently, neither Mr. Hempel, nor Mr. Westerfield, nor their attorneys had advised St. Paul of the settlement with Ranger. It is that failure to disclose the Ranger settlement that St Paul now alleges to be fraudulent.

### D. The lost policy

A dispute also arose about whether the Insurance Company of North America (INA) had issued a policy (GLP 090925) to Mr. Westerfield. The only reference to the existence of that policy is contained in an addendum to an INA excess insurance policy. The addendum listed policies held by Mr. Westerfield and described the period of coverage provided by the disputed GLP policy as from January 1, 1968 to January 1, 1969. It described the policy in the following terms:

> Professional Liability
> Bodily Injury liab
> $100,000 each person
> $300,000 each occur
> Property damage liab
> $50,000 each occurance [sic]

Aplts' App. (case nos. 97-2136, 2147) vol. I, at 109.

INA presented testimony from one of its agents, B.H. Kinney, regarding the significance of the addendum. Mr. Kinney stated that the GLP policy provided

16

general liability coverage for certain of Mr. Westerfield's commercial properties and that the policy did not afford professional liability coverage, despite the contrary indication in the addendum.   He also stated that the coverage limits listed in the addendum, specifically the split limits for personal injury or property damage, were inconsistent with professional liability coverage. The record also indicates that, in the years following the policy period, Mr. Westerfield never identified or listed the GLP policy on applications for additional professional insurance.

E.  The state court trial

The state court trial was held on March 22, 1994 before Judge Phillip Ashby.  At the beginning of the proceedings, the lawyers representing Messrs. Hempel and Westerfield informed the judge that they had reached a settlement under which a judgment would be entered against Mr. Westerfield.  Mr. Cheney (Mr. Westerfield's lawyer) further explained that the judgment would be "not recourse against Mr. Westerfield personally" and that "there is an assignment of proceeds of claims against . . . nonsettling carriers, which will be pursued by Mr. Hempel and Mr. Westerfield."  Aplts' App. (case nos. 97-2190, 2194, 2195) vol. VII at 2061.  He added that he had been instructed not to expend any further efforts to defend Mr. Westerfield, not because "[Mr.] Westerfield would not like

17

to defend his interest . . . [but] because he's not in a position to do so." Id. The parties offered the written settlement agreement between Messrs. Hempel and Westerfield into evidence. The judge indicated that, as he understood the trial, "the whole purpose of this is to allow the Hempels to get a judgment which would allow them to seek whatever remedies they wish against the other [nonsettling] carriers." Id. at 2062.

On behalf of Mr. Hempel, Mr. McKetta called four witnesses. In response, Mr. Cheney did not conduct cross examination, did not call any witnesses on behalf of Mr. Westerfield, and did not make an opening statement or a closing argument.

Mr. McKetta began with Forrest Smith, a New Mexico attorney who had worked as the head of a trust department of a bank in Santa Fe and who testified as an expert witness. Mr. Smith explained that he had reviewed the pleadings and evidence in the case, including the will of Daniel Mudge, orders of the probate court, files maintained by the Bank (as trustee of the Residuary and Annuity trusts), and various accountings performed by the Bank and the executor of the Mudge estate.

Based on this evidence, Mr. Smith stated that Eugene Graham, the Bank, and Mr. Westerfield had all breached their fiduciary duties to Ada Mudge as a beneficiary of the trusts. As to Mr. Westerfield, Mr. Smith explained that his

18

actions following his appointment as the attorney for the trustee bank in 1964 revealed a conflict of interest: Mr. Westerfield had acted in furtherance of the interests of two of the beneficiaries (Mrs. Graham and Mrs. Tauche) rather than in the interests of all of the beneficiaries, including Ada Mudge  In certain instances, Mr. Westerfield had learned of improper distributions of trust assets to Mrs. Graham and Mrs. Tauche, but he had failed to disclose these distributions to Ada Mudge and had also failed to protect her interests by seeking to recover these assets for the trusts.  He agreed that Mr. Westerfield's failure to disclose this information "result[ed] in a continued failure for Ada Mudge during her lifetime to continue to enjoy the substantial benefits that Daniel Mudge had designed under his . . . trusts for her."  Id. at 2153.

Next, Mr. McKetta called Mr. Hempel and his wife.  They both testified about their reliance on Mr. Westerfield in the management of the trusts.

Finally, Mr. McKetta called Mr. Gilmore, the certified public accountant, who testified as to the damages sustained by Mrs. Mudge as a result of improper actions of Mr. Graham, the Bank, and Mr. Westerfield.  For each of the trusts, Mr. Gilmore offered five different methods for calculating damages.  The methods differed in their treatment of the stock dividends, stock spin-offs, and stock splits that constituted trust assets.  In particular, the methods varied in whether these categories of assets were treated as income or as principal.  For

19

example, Mr. Gilmore's first method treated stock dividends as income and spinoffs and splits as principal. The second method treated stock dividends and splits as principal and spinoffs as income.

Mr. Gilmore also based his calculations under each method on different interest rates. Thus, he arrived at differing dollar figures using the first method (dividends as income; spinoffs and splits as principal) by performing the calculations under a fifteen percent interest rate, a twelve percent rate, a nine percent rate, and so forth. He also made differing assumptions about whether 5,000 shares of stock (removed from the trusts by Mr. Graham) should be included in the calculations. Significantly, Mr. Gilmore did not offer an opinion as to which method was the proper one.

At the conclusion of the evidence, Judge Ashby concluded that "there was clear legal malpractice . . . and breach of fiduciary duty by Mr. Westerfield." Id. at 2235-36. He added that he did not understand why the problems in the trust were not corrected in the 1960s and that "at least as early as 1975, the bank itself and the trust attorney became aware of the problem and they went to some lengths to conceal matters." Id. at 2235.

Judge Ashby then asked Mr. McKetta which of Mr. Gilmore's methods of calculating damages he believed to be proper. Mr. McKetta informed the judge that the proposed findings had employed the first method and that was his

20

recommendation.  Judge Ashby accepted that recommendation, but indicated that the fifteen percent interest rate proposed by Mr. McKetta was too high.  Instead, he ruled that interest should be calculated at nine percent.

Based on these rulings, Mr. McKetta submitted proposed findings of fact and conclusions of law, which Judge Ashby adopted.  The judge concluded that Mr. Graham and the Bank had committed willful breaches of trust, that Mr. Westerfield had knowingly participated in the bank's breaches of trust, and that Mr. Westerfield's conduct from 1964 through 1991 constituted negligence and was the proximate cause of the losses suffered by Ada Mudge.

Based on Mr. Gilmore's first method and on Mr. McKetta's recommendation, the judge determined that the estate of Ada Mudge had sustained $29,431,851 in damages.  From that amount, he offset $3,050,000 that Mr. Hempel had previously received on behalf of the estate in settlements with other parties.  Accordingly, the court entered judgment in favor of Mr. Hempel and against Mr. Westerfield for $26,381, 851.      Id. at 2247.


### F.  The federal district court's rulings

#### 1.  Summary judgment on collusion

 In the instant case, the federal district court ruled as a matter of law that the parties to the state court lawsuit had engaged in collusion.      See Continental

21

Casualty Co. v. Westerfield, 961 F. Supp. 1502, 1507-09 (D.N.M. 1997). In support of this ruling, it cited several characteristics of the state court proceeding: (1) the fact that "the presiding judge did not perceive the commonality of interest in the supposedly adverse parties appearing before him and that failing to actively defend could actually serve to benefit [Mr.] Westerfield financially;" id. at 1507-08; (2) Mr. Cheney's failure to present various colorable defenses; (3) the fact that Mr. McKetta negotiated settlements with the remaining defendants other than Mr. Westerfield, thereby "eliminat[ing] any chance that Judge Ashby would hear any evidence or argument contrary to that presented by [Mr.] Hempel in his prima facie case on liability and as to damages;" id. at 1508; and (4) the fact that Mr. McKetta submitted proposed findings and conclusions (ultimately adopted by Judge Ashby) that assessed damages for the period from 1964 to 1983, thus eliminating the possibility of that any of Mr. Hempel's damages would be attributed to the period after 1983—when one of the settling insurers had provided coverage.

Accordingly, the court concluded: "To fail to find collusion in fashioning an unreasonable settlement under these circumstances would be to authorize manipulation which compromises the integrity of the adversary system." Id. at 1509. Nevertheless, in this ruling, the district court stopped short of finding that the collusive state court judgment relieved the insurers of all obligations. Instead,

22

it said, the import of its summary judgment ruling on the collusion issue was that Messrs. Hempel and Westerfield "were not entitled to any res judicata or collateral estoppel effect as to the state court proceeding." Id. Thus, the duty to defend the state court lawsuit and the duty to indemnify the judgment remained at issue in the case.

2. Suumary judgment on the "no risk" issue

Upon further briefing, the district court ruled that the insurers were entitled to judgment as a matter of law "that the collusive settlement agreement extinguished any obligations owed to [Mr.] Westerfield under their respective contracts of insurance." Aplts' App. (case nos. 97-2190, 2194, 2195) vol. IX, at 2869-70. The court reasoned that the combination of Mr. Hempel's covenant not to execute on Mr. Westerfield's assets with Mr. Westerfield's retention of ten percent of the proceeds of the bad faith claims that he assigned to Mr. Hempel transformed the Hempel-Westerfield agreement "from a shield into a sword." Id. at 2869. The elimination of any actual risk from a judgment against him in the state court proceedings extinguished the insurers' obligations to him under the subject policies.

3. Summary judgment on St. Paul's fraud claim

23

The district court granted summary judgment against St. Paul and in favor of Messrs. Hempel and Westerfield on St. Paul's claim that the two men had fraudulently induced St. Paul into entering into a separate settlement for $300,000. The court found no evidence in the record that Mr. McKetta's March 15, 1994 offer pertained to the coverage provided by St. Paul. It also concluded that the letter did not express the final understanding of the parties.

4. Summary judgment as to the lost policy issue

Finally, the court granted summary judgment to INA on Mr. Westerfield's claim for coverage under the lost policy. Noting that "New Mexico law requires the insured to bear the burden of establishing the existence and terms of a lost insurance policy," the court concluded that Mr. Westerfield had provided no evidence regarding the policy's terms. See Aplts' App. (case nos. 97-2136, 2147) vol. II, at 490 (citing Harden v. St. Paul Fire & Marine Ins. Co., 178 P.2d 578, 579 (N.M. 1947)).

## II. DISCUSSION

Mr. Hempel and Mr. Westerfield now appeal the district court's grant of summary judgment against them on the collusion and no risk issues. (Case nos.

24

97-2190, 97-2194). St. Paul appeals the district court's rejection of its fraud claim. (Case no. 97-2195). In a fourth appeal, Mr. Westerfield argues that the district court erred in granting summary judgment to INA on his claim to recover under the allegedly lost policy. (Case no. 97-2136). Finally, in a cross-appeal, INA argues that, in the event that this court concludes that the district court erred in assessing the evidence regarding the lost policy, the court's grant of summary judgment in favor of INA should be affirmed on alternative grounds. (Case no. 97-2147).

We begin our analysis by addressing Mr. Hempel's and Mr. Westerfield's challenges to the district court's rulings regarding "collusion" and "no risk." Then, we address St. Paul's appeal of the adverse ruling on its fraud claim and Mr. Westerfield's appeal of the court's grant of summary judgment against him on his lost policy claim. Because we affirm the district court's decision on the lost policy claim, we do not consider the issues raised in INA's cross-appeal.

### A. Hempel's and Westerfield's appeal on "collusion" and "no risk"
(Case nos. 97-2190, 97-2194)

Messrs. Westerfield and Hempel both argue on appeal that the district court erred in ruling as a matter of law that the $26.38 million judgment entered by the

25

New Mexico state district court was collusive. They maintain that "the essence of 'collusion' is that the alleged conspirators were acting (1) secretly and (2) for the purpose of achieving some fraudulent or deceitful purpose." Westerfield Br. in Chief at 6. Here, they contend, there is evidence that both the insurers and the trial judge knew about the Hempel-Westerfield agreement that resulted in the judgment. They also argue that there is evidence that St. Paul consented to the agreement and is therefore precluded from challenging it now.

Mr. Hempel raises two additional arguments: that the district court's ruling that the insurers were not obligated to indemnify Mr. Westerfield constituted an improper review of a state court judgment; and that, even if the district court correctly concluded that Mr. Westerfield should not be indemnified on the state court judgment, the court imposed the wrong remedy: rather than relieving the insurers of their obligations under the policies, the court should have remanded the case to the New Mexico state court for a trial on the merits of Mr. Hempel's claims.

We engage in de novo review of the district court's grant of summary judgment, applying the same standard as the district court pursuant to Fed. R. Civ. P. 56. See Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir.1998). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

26

show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Jones v. Kodak Med. Assistance Plan, 169 F.3d 1287, 1291 (10th Cir. 1999). In this diversity case, we apply the substantive law of New Mexico. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Adams-Arapahoe Sch. Dist. No. 28-J v. GAF Corp., 959 F.2d 868, 870 (10th Cir. 1992).

## 1. Stipulated judgments combined with covenants not to execute on the assets of the insured.

Under New Mexico law, insurers that improperly refuse to defend their policyholders may face serious consequences, including the loss of the right to claim that the insured has breached the policy provisions and has not cooperated. State Farm Fire & Cas. Co. v. Price, 684 P.2d 524, 531 (N.M. Ct. App. 1984), overruled on other grounds, Ellingwood v. N.N. Investors Life Ins. Co. 805 P.2d 70 (N.M.1991). Additionally, an insured whose insurer has refused to defend him may enter into a settlement of the claims that have been asserted against him. See Rummel v. Lexington Ins. Co., 945 P.2d 970, 984-85 (N.M. 1997); American Gen. Fire & Cas. Co. v. Progressive Cas. Co., 799 P.2d. 1113, 1117 (N.M. 1990); Price, 684 P.2d at 531.

Thus, an insurer that wrongfully fails to defend an insured "generally becomes liable for a judgment entered against the insured and for any settlement

27

entered against the insured in good faith." Price, 684 P.2d at 531. However, "[t]he settlement must be reasonable." Id. (emphasis added). Thus, in spite of the insured's authority to settle a claim after the insurer has refused to provide a defense, "[a] settlement that is the product of fraud or collusion at the expense of a nonparticipating insurer would release that insurer from any obligation under the settlement." Rummel, 945 P.2d at 984; see also American Gen., 799 P.2d. at 1117 (stating that a "settlement [negotiated by an insured after an insurer has unjustifiably failed to defend him] must be reasonable, and the insurer is not precluded from asserting as a defense that the settlement was unreasonable"); Valley Improvement Ass'n v. United States Fid. & Guar. Corp., 129 F.3d 1108, 1125-26 (10th Cir. 1997) (applying New Mexico law, citing Price, and stating that settlements negotiated by an insured after an insurer has wrongfully refused to defend must be reasonable).

These New Mexico decisions illustrate a principle espoused by many courts: an insured who has been "exposed . . . to the sharp thrust of personal liability" by an insurer's breach of its obligations "need not indulge in financial masochism." Samson v. TransAmerica Ins. Co., 636 P.2d 32, 45 (Cal. 1981) (quoting Critz v. Farmers Ins. Group, 230 Cal. App.2d 788, 801 (Cal. 3d Dist. Ct. App.1964)). Instead, within the bounds of reason, the insured is free to enter into "the best settlement possible" with the claimant. Pruyn v. Agricultural Ins. Co.,

28

42 Cal. Rptr. 295, 303 (Cal. 2d Dist. Ct. App.1995).

As the district court recognized, one protective device that has been adopted by policyholders is a stipulated or consent judgment coupled with a covenant not to execute.    See Pruyn, 42 Cal. Rptr at 305-08 (discussing "stipulated or consent judgment[s] which [are] coupled with a covenant not to execute"); Stephen R. Schmidt, "The Bad Faith Setup," 29     Tort & Ins. L. J.  705, 719-39 (1994) (same).    These arrangements typically involve the following components:  (1) the insured pays little or nothing to the plaintiff in the underlying case and may even reserve a portion of any money collected from the insurer; (2) the plaintiff and the insured agree to the entry of a judgment against the insured, fixing the amount of damages or agreeing as to liability and requesting a court to determine the amount of damages; (3) the plaintiff agrees not to seek payment of damages from the insured; "[u]sually this involves a covenant not to execute on the assets of the defendant, but it may be phrased as a covenant to execute on or collect the judgment only from one asset of the defendant (his rights under the insurance policy) or structured as a provision in the judgment making it collectible only to the extent that insurance may apply;" and (4) the insured assigns to the plaintiff all of his or her rights against the insurer.  Schmidt,   supra, at 719-20

These settlements offer substantial protection for individuals whose

29

insurers have wrongfully refused to defend them.  Nevertheless, they also have "the high potential for fraud or collusion" because "[w]ith no personal exposure the insured has no incentive to contest liability or damages" and "the insured's best interests are served by agreeing to damages in any amount as long as the agreement requires that the insured will not be personally responsible for those damages."  See Pruyn, 42 Cal. Rptr. at 305;  see also Schmidt, supra, at 728.

Like the district court and the parties, we have unearthed no New Mexico decisions that have specifically determined whether a consent judgment coupled with a covenant not to execute may be enforced against an insurer.  However, in a number of other jurisdictions, courts have considered a variety of factors in resolving this question, including:  the insured's authority (under the policy or the law of the jurisdiction) to settle the case under the circumstances, the reasonableness of the settlement, and whether the settlement was the product of bad faith, fraud, or collusion.  See Schmidt, supra, at 721 (collecting cases).  In this context, "collusion" and "fraud" are often defined broadly and "are not necessarily tantamount to the tort of fraud in that there need not be a misrepresentation of a material fact."  Id.

> Any negotiated settlement involves cooperation to a degree. It becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant. Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of

30

> serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer. They have in common unfairness to the insurer, which is probably the bottom line in cases in which collusion is found.

Id.

These more specific factors comport with the general reasonableness inquiry that New Mexico courts have undertaken in assessing settlements negotiated by policyholders whose insurers have wrongfully refused to defend them. See Rummel, 945 P.2d at 984; American General, 799 P.2d. at 1117; Price, 684 P.2d at 531. Accordingly, in considering the reasonableness of the settlement between Messrs. Hempel and Westerfield, we look to some of the factors on which courts from other jurisdictions have relied.

In particular, we consider "what a reasonably prudent person in the position of [Mr. Westerfield] would have settled for on the merits of plaintiff's claim." See Miller v. Shugart, 316 N.W.2d 729, 735 (Minn. 1982); see also Rhodes v. Chicago Ins. Co., 719 F.2d 116, 120 (5th Cir. 1983) (concluding that, under Texas law, "[t]he insured must demonstrate only that, in settling, his conduct conformed to the standard of a prudent uninsured"); Red Giant Oil Co. v. Lawlor, 528 N.W.2d 524, 535 (Iowa 1995) (following Miller and concluding that "the settlement which resulted in the judgment must be reasonable and prudent"). As part of this inquiry, we examine the damages incurred by Mr. Hempel, the merits

31

of Mr. Hempel's theory, the merits of Mr. Westerfield's defenses, Mr. Westerfield's relative fault in relation to other parties who could be held liable, and the degree of probability of Mr. Hempel's success. See Miller, 316 N.W.2d at 735 (considering "the facts bearing on the liability aspects of plaintiff's claim, as well as the risks of going to trial"); F. Burbach v. Armstrong Rigging & Elec. Co., 560 N.W.2d 107, 110 (Minn. Ct. App. 1997) (stating that the trial "court should have addressed the relative liability of the parties, the risks of trial, and, perhaps most importantly, whether a reasonable and prudent defendant would have settled for $825,000"); Wolff v. Royal Ins. Co., 472 N.W.2d 233, 235 (S.D. 1991) (considering "the size of possible recovery and degree of probability of claimant's success against the insured"); Chaussee v. Maryland Cas. Co., 803 P.2d 1339, 1343 (Wash. Ct. App. 1991) (considering "the releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released") (quoting Glover v. Tacoma Gen. Hosp., 658 P.2d 1230, 1236 (Wash. 1983)); see generally Schmidt, supra, at 725-35 (collecting cases).

In addition to the amount of the judgment, consideration of the procedure

through which it was entered is also appropriate. In this regard, the mere fact that a state court judge approved the Hempel-Westerfield settlement is not sufficient to render it reasonable. Instead, following the decisions of other courts, we examine whether there was "an independent adjudication of the facts based on an evidentiary showing" and whether the process adopted by the parties and the court "creat[ed] the potential for abuse, fraud, or collusion." See National Union Fire Ins. Co. v. Lynette C., 27 Cal. App. 4th 1434, 1438 (Cal. 3d Dist. Ct. App.1994). Of course, under New Mexico law, evidence establishing actual fraud or collusion between Messrs. Hempel and Westerfield would also render their agreement unenforceable against nonparticipating insurers. See Rummel, 945 P.2d at 984.

2. The Hempel-Westerfield settlement and resulting judgment.

Applying these principles, we conclude that the district court properly determined that the Hempel-Westerfield settlement and resulting state court judgment were unenforceable against the nonparticipating insurers. Most directly, the record establishes that the amount of the judgment—$26.38 million—is unreasonable. Additionally, the procedure through which the judgment was entered—an uncontested trial in which plausible defenses were not advanced and in which plaintiff and defendant had a joint interest in maximizing

33

the amount recovered—evinces collusion between the parties.

As to the amount of the judgment, the $26.38 million figure is wildly out of proportion to the valuation of Mr. Hempel's claim provided by other sources. As the insurers have noted, approximately five months before the state court trial, Mr. Hempel's attorney made a settlement demand as to all the defendants for $5.5 million. Additionally, Mr. Westerfield's attorney located an expert who calculated Mr. Hempel's damages at $2.8 million under a worst case scenario. Other defendants settled for much lower amounts—the Mudges' daughters for a collective $650,000 and the Bank for $1,150,000. Messrs. Hempel and Westerfield have not cited any evidence from the state court trial suggesting that Mr. Westerfield should have borne a substantially greater degree of responsibility for the damages incurred by Mr. Hempel than these other defendants or the original trustee (Mr. Graham). Thus, the record offers no support for the inference that "a reasonably prudent person in the position of [Mr. Westerfield] would have settled . . . the merits of [Mr. Hempel's] claim" for $26.38 million. See Miller, 316 N.W.2d at 735.

Moreover, the record indicates that Mr. Westerfield had several substantial defenses that were not presented at the state court trial. As the district court observed, Mr. Westerfield could have argued that Mr. Hempel's claims were barred by the statute of limitations. He could have argued that various stock

34

transactions should have been treated as principal rather than income, thereby reducing Mr. Hempel's damages. Indeed, Mr. Cheney had consulted with experts who supported such a theory. Moreover, perhaps the strongest argument that Mr. Westerfield could have advanced was that Mr. Hempel's damages should have been apportioned among other persons and entities. See Continental Cas. Co., 961 F. Supp. at 1508 (noting that the state court expressly found that the trustee who preceded Mr. Westerfield, the Bank, and the two Mudge daughters all participated in willful and knowing breaches of the trust). In fact, the trial judge later testified in a deposition that he would have considered apportioning liability against other parties had he been asked to do so. See Aplts' App. (case nos. 97-2190, 2194, 2195) vol. VIII, at 2414. The failure of Mr. Westerfield to raise any of these defenses supports the district court's conclusion that the Hempel-Westerfield agreement was collusive.

In our view, none of the factors identified by Mssrs. Hempel and Westerfield undermine the conclusion that the settlement and the resulting judgment were unreasonable and collusive. In particular, although they correctly observe that Mr. Cheney informed both the state trial judge and the insurers that he proposed to settle the case by means of a consent judgment and a covenant not to execute, that fact does not establish that the judge or the insurers knew about several key aspects of the arrangement: that Mr. Westerfield had retained a ten

35

percent interest in the amount of any judgment rendered against him and that the trial would consist of an attempt to obtain as high a judgment as possible.

We do agree that allegations of collusion and assertions that settlements are unreasonable often involve factual disputes that are inappropriate for resolution on summary judgment. Indeed, in several of the New Mexico cases that we have discussed, the courts concluded that there were factual issues warranting a trial. See, e.g. , Rummel , 945 P.2d 982-85; Price , 684 P.2d at 531. However, these decisions do not establish that summary judgment is never appropriate when these issues are raised. As the insurers have noted, courts have found collusion or unreasonableness as a matter of law when the evidence in the record indicated that a factfinder could reach no other conclusion. See, e..g. , Purdy Co. v. Transp. Ins. Co. , 568 N.E.2d 318, 324 (Ill. Ct. App. 1991) (affirming trial court's grant of summary judgment on the grounds that an agreement was collusive).


3. Alleged ratification by St. Paul

As noted above, Messrs. Hempel and Westerfield also argue that St. Paul ratified their settlement agreement and is therefore precluded from challenging the settlement and the resulting judgment in this federal case. Their argument is based on two alleged indicia of St. Paul's consent: (1) in a separate agreement

36

(executed on March 31, 1994) under which it paid $300,000 to Mr. Hempel pursuant to a policy that it had issued to Mr. Westerfield, St. Paul acknowledged that the March 31, 1994 agreement "arises out of" the final state court judgment; and (2) St. Paul agreed to allow Mr. Cheney to represent its interests. We are persuaded by neither item of evidence.

Under New Mexico law, ratification may be inferred by a principal's acquiescence in the results of an unauthorized act of an agent. See Jessen v. National Excess Ins. Co., 776 P.2d 1244, 1249 (N.M. 1989). "One may infer affirmance by a principal of an unauthorized transaction of its agent from the principal's failure to repudiate it." Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc., 639 P.2d 75, 79 (N.M. Ct. App. 1981). Under those standards, neither incident of alleged acquiescence supports the theory that St. Paul ratified the Hempel-Westerfield settlement and resulting judgment.

As to the March 31, 1994 agreement, that document merely states that [t]his settlement arises out of controversies and disputes among Hempel, Westerfield, and others related to facts and circumstances alleged in the above referenced lawsuit . . . and to a final judgment entered in the Lawsuit on March 22, 1994." Rec. (case nos. 97-2190, 2194, 2195) vol. VI, at 1713 (emphasis added). An acknowledgment that the agreement "arises out of controversies . . . related to" the judgment in the lawsuit cannot be reasonably read as an agreement that St.

37

Paul consented to indemnify Mr. Westerfield on that judgment. Moreover, the March 31, 1994 agreement further states that it reflects the full understanding of the parties, and there is no reference in the agreement to St. Paul's purported ratification of the state court judgment.

Additionally, the evidence cited by Messrs. Hempel and Westerfield does not support their contention that Mr. Cheney's negotiation of the consent judgment and covenant not to execute should be imputed to St. Paul. Although a reasonable factfinder could conclude that St. Paul agreed to Mr. Cheney providing a legitimate defense in the state court lawsuit, there is no indication that St. Paul agreed to the entry of a grossly inflated judgment or to provide indemnification in that grossly inflated amount.

4. The Rooker-Feldman doctrine

In a final challenge to the district court's ruling that the Hempel-Westerfield judgment and resulting settlement were unreasonable and collusive, Mr. Hempel invokes the Rooker-Feldman doctrine, arguing that the ruling constitutes an improper collateral attack on the state court judgment. See District of Columbia Ct. App. v. Feldman, 460 U.S. 462, 476 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923). In a related argument, he contends that, in the event that this court agrees that the state court judgment was collusive, the

38

case should be remanded to the state trial court for a new trial.

Under the Rooker-Feldman doctrine, a federal district court lacks jurisdiction to review a final state court judgment. Thus, it may not review "matters actually decided by a state court," and it may not issue "any declaratory relief that is inextricably intertwined with the state court judgment." Kiowa Indian Tribe of Okla. v. Hoover, 150 F.3d 1163, 1169 (10th Cir.1998) (internal quotation marks and citations omitted).

There are, however, significant limitations on the scope of the doctrine. "If the purpose of a federal action is separable from and collateral to a state court judgment, then the claim is not inextricably intertwined merely because the action necessitates some consideration of the merits of the state court judgment." Id. at 1170-71 (internal quotation marks omitted). Moreover, both the Supreme Court and this circuit have found the Rooker-Feldman doctrine inapplicable when the party against whom it is invoked was not a party to the state court proceedings. See Johnson v. De Grandy, 512 U.S. 997, 1006 (1994) (stating that "invocation of Rooker/Feldman is . . . inapt here, for unlike Rooker or Feldman, the United States was not a party in the state court"); Johnson v. Rodrigues (Orozco), 226 F.3d 1103, 1108 (10th Cir. 2000) (observing that the plaintiff "was not a party to the state court adoption proceeding, a fact which makes the [ Rooker-Feldman ] doctrine inapplicable").

39

Applying those principles, we do not agree with Mr. Hempel that the federal district court's ruling constituted an improper collateral attack on the state court judgment. The insurers here did not seek review of a matter actually decided by a state court. Rather than seeking to relitigate the question of Mr. Westerfield's liability to Mr. Hempel—the matter actually decided in the state court proceeding—they requested only a determination of their duty to indemnify Mr. Westerfield. That question is not inextricably intertwined with the merits of the state court action. As our ruling here demonstrates, the fact that the judgment remains valid against Mr. Westerfield is not inconsistent with the conclusion that that the insurers are not required to indemnify him for it.

Mr. Hempel's second argument—that this court should vacate the judgment against Mr. Westerfield and remand the case to the state court for a new trial—is also not supported by the Rooker-Feldman doctrine. Such a ruling would place this court in the role of an appellate tribunal for the New Mexico courts. This is precisely what the Rooker-Feldman doctrine forbids. See Anderson v. State of Colorado, 793 F.2d 262, 264 (10th Cir.1986) (noting that federal district courts do no have jurisdiction to review final state court judgments in judicial proceedings).

5. Conclusion

40

For the reasons set forth above, we conclude that, in its rulings on "collusion" and "no risk," the district court properly held that CNA and St. Paul are not obligated to indemnify Mr. Hempel and Mr. Westerfield on the $26.38 million judgment.

### B. St. Paul's appeal of its fraud claim
(case no. 97-2195)

St. Paul's fraud claim is based on its reading of the March 15, 1994 note from Mr. McKetta to Mr. Cheney. As noted above, Mr. McKetta stated in that letter that Mr. Hempel "offers to settle with [Mr.] Westerfield for the coverage year time period afforded by the Ranger policy for $1,000,000—well under the $5 mm policy limits." Aplts' App. (case nos. 97-2190, 97-2194, 97-2195) vol. II, at 457. St. Paul's theory is that Mr. McKetta's offer constituted not merely a proposal to settle as to the Ranger policy but rather an offer to settle with all insurers for the time period specified in the policy (December 5, 1975 through January 5, 1977). According to St. Paul, when Ranger agreed to the $1 million amount on March 17, 1994, St. Paul was released from liability under its policies. Thus, under this theory, Mr. McKetta's offer on March 18, 1994 to settle under St. Paul's policy for $300,000 constituted fraud because Mr. McKetta did not disclose the alleged terms of the prior $1 million settlement.

We agree with the district court's analysis rejecting St. Paul's fraud claim.

41

As the court noted, St. Paul's reading of the March 15, 1994 offer from Mr. Cheney is not plausible. "If extinguishing St. Paul's liability was intended as part of the note's offer, the note would not have indicated that the $1,000,000 figure was 'well under the $5,000,000 policy limits.' The $5,000,000 figure reflects only Ranger's excess policy limits and ignores the $300,000 St. Paul occurrence policy for the same period." Aplts' App. (case nos. 97-2190, 2194, 2195) vol. IX, at 2854. Moreover, St. Paul has not identified any evidence in the record indicating that the parties to the $1,000,000 settlement intended St. Paul to be a third party beneficiary.

Additionally, even if one views Mr. McKetta's March 15, 1994 letter as ambiguous with regard to the release of St. Paul, there is no indication that Mr. Westerfield, Mr. Cheney, Ranger, Mr. Hempel, and Mr. McKetta arrived at a meeting of the minds on the terms suggested by St. Paul. Mr. Cheney, Mr. McKetta, and Ranger's counsel all testified that the terms of the settlement involving the $1,000,000 payment by Home were set forth in the written agreement signed on March 21, 1994. That written agreement provides for a $1,000,000 payment by Ranger and a $300,000 payment by St. Paul. It further provides that it "reflects the full understanding of These Parties concerning its subject matter" and that "there are no side agreements or understandings or promises or representations relied upon by any party other than as expressly set

42

out herein." <u>Id.</u> at 489. Any ambiguity in Mr. McKetta's March 15, 1994 offer is properly resolved by the considering the terms of the March 21, 1994 agreement. <u>Cf</u>. <u>Johnson v. Star Iron & Steel Co.</u>, 511 P.2d 1370, 1374 (Wash. App. 1973) ("At the very least, the offer was ambiguous to the extent that no mutual assent was possible by the acceptance made.").

Accordingly, the district court properly granted summary judgment against St. Paul and in favor of Messrs. Hempel and Westerfield on St. Paul's fraud claim.


### C. Mr. Westerfield's appeal of the INA lost policy claim
(case no. 97-2136)


Messrs. Hempel and Westerfield also argue that the district court erred in granting summary judgment to the defendant INA on their claim to recover under an alleged professional liability policy. As the district court observed, the only evidence of such a policy was an addendum to an INA excess insurance policy. The addendum sets forth a list of underlying policies providing coverage for the period from January 1, 1968 to Janaury 1. 1969. It provides only a very general description of the alleged policy:

> Professional Liability
> Bodily Injury liab
> $100,000 each person
> $300,000 each occur

43

Property damage liab
$50,000 each occurance (sic)

Aplts' App. (case nos. 97-2136, 2147) vol. I, at 109. According to Messrs. Hempel and Westerfield, this addendum constitutes sufficient evidence from which a trier of fact could reasonably infer that the subject policy provided coverage for the claims asserted by Mr. Hempel.

In assessing this claim, we must consider the burden of proving the existence and terms of a lost policy. Despite their procedural nature, burdens of proof are sufficiently related to substantive rights that they are governed by state law in diversity actions. See Cities Serv. Oil Co. v. Dunlap, 308 U.S. 208 (1939); Oja v. Howmedica, Inc., 111 F.3d 782, 792 (10th Cir.1997) (concluding that, as to causes of action arising under state law, a federal court usually "examine[s] the evidence in terms of the underlying burden of proof as dictated by state law").

Under New Mexico law, there is some question as to the applicable burden of proof. Some decisions conclude that a party seeking to prove the existence and terms of a lost will or deed must do so by clear and convincing evidence. See Barngrover v. Estate of Barngrover, 618 P.2d 386, 390 (N.M. 1980); Johnson v. Johnson, 396 P.2d 181, 184-5 (N.M. 1964). However, these decisions do not involve insurance policies. As a result, like the district court, we will afford Messrs. Hempel and Westerfield the benefit of the doubt by assuming that, under

44

New Mexico law, the lesser standard—preponderance of the evidence—applies to the claim to recover on the lost policy. Cf. Servants of the Paraclete v. Great Am. Ins. Co., 857 F. Supp. 822, 828 (D.N.M. 1994) (concluding, as a matter of federal law, that the burden of proving the existence and terms of a lost insurance policy is by a preponderance of the evidence).

In support of its summary judgment motion, INA offered an affidavit from B.H. Kinney, the insurance agent who issued the addendum that refers to the alleged policy at issue. Mr. Kinney stated that the initials "GLP" were used to refer to general liability coverage for commercial properties. He could recall no instance in which a GLP policy had provided professional liability coverage. Additionally, Mr. Kinney reported that the liability limits set forth on the addendum (i.e. $100,000 per person, $300,000 per occurrence, etc.) were inconsistent with professional liability coverage. He characterized the reference to professional liability in the addendum as likely to have been a mistake.

Other evidence in the record supports Mr. Kinney's assessment. INA produced various specimen forms of "GLP" policies that were available between January 1, 1968 and January 1, 1969. None of them provided for professional liability coverage. In addition, in subsequent applications for professional coverage, Mr. Westerfield listed prior professional liability policies but never identified the alleged policy at issue here.

45

In response to this evidence, Messrs. Hempel and Westerfield challenge INA's reliance on Mr. Kinney's testimony, noting that Mr. Kinney had no recollection of having seen the alleged policy and contending that, as a result, he could not testify about its terms. We are not convinced by this argument. In spite of his lack of first-hand knowledge about the terms of a particular policy, Mr. Kinney was still competent to testify about INA's practices and procedures, including the kinds of policies the company issued. See Mobile Exploration & Producing U.S., Inc. v. Cajun Constr. Servs., 45 F.3d 96, 99 (5th Cir. 1995) (noting that "[h]abit evidence is relevant to prove that a business acted in a certain way").

Significantly, the evidence in the record here contrasts markedly with the evidence in cases in which courts have found triable issues of fact regarding the existence and terms of a lost policy. See, e.g., Township of Haddon v. Royal Ins. Co. of Am., No. 95-701, 1996 WL 549301, at * 3 (D.N.J. Sept 19, 1996) ("The nearly identical wording of the relevant terms of the policies immediately preceding and immediately following the lost policy strongly suggests that the relevant terms of the missing policy are, too, nearly identical."); UTI Corp. v. Firemans Fund Ins. Co, 896 F. Supp. 362, 381 (D. N.J. 1995) (considering specimen policies and correspondence referring to the alleged lost policy in concluding that there were triable issues regarding the policy's existence and

46

terms); Bell Lumber & Pole Co., v. United States Fire Ins. Co, 847 F. Supp. 738, 743 (D. Minn. 1994) (relying in part on evidence that a standard, pre-printed policy provided the same coverage as alleged under the lost policy), aff'd, 60 F.3d 437 (8th Cir. 1995). Moreover, in instances resembling the present case, courts have rejected claims to recover under lost policies. See, e.g., Bituminous Cas. Corp. v. Vacuum Tanks, Inc., 975 F.2d 1130, 1132 (5th Cir. 1992) (evidence of policy numbers, dates, and amounts of coverage insufficient to establish existence and terms of policy); Boyce Thompson Inst. for Plant Research v. Insurance Co. of N. Am., 751 F. Supp. 1137, 1140 n.2 (S.D.N.Y. 1990) (mention of policy number in another document insufficient to establish existence and terms of alleged policy).

Accordingly, we conclude that Messrs. Hempel and Westerfield have failed to offer sufficient evidence to rebut the evidence produced by INA indicating that the referenced GLP policy, if it existed, did not provide coverage to Mr. Westerfield for the underlying state court judgment. Thus, the district court properly granted summary judgment in favor of INA and against Mr. Westerfield on the claim to recover under the alleged lost policy.[1]

---

[1] In light of this conclusion, we need not address the issues raised in INA's cross-appeal.

III. CONCLUSION

For the reasons set forth above, in case nos. 97-2190 and 97-2194, we AFFIRM the district court's grant of summary judgment in favor of the defendant insurers and against Mr. Hempel. In case no. 97-2195, we AFFIRM the district court's grant of summary judgment in favor of Mr. Hempel and Mr. Westerfield and against St. Paul. In case no. 97-2136, we AFFIRM the district court's grant of summary judgment in favor of INA and against Mr. Westerfield. Finally, in case no. 97-2147, we DISMISS INA's cross-appeal.

Entered for the Court,


Robert H. Henry
United States Circuit Judge